1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

JOHNNY LEE VANG,

Petitioner,

12

13          v.

14

15

MICHAEL McDONALD,

Respondent.

16

Case No. 1:11-cv-00245 LJO MJS (HC)

**FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS**

17

18          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

19    corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by David Andrew

20    Eldridge of the office of the California Attorney General.

21    **I.      PROCEDURAL BACKGROUND**

22          Petitioner is currently in the custody of the California Department of Corrections

23    pursuant to a judgment of the Superior Court of California, County of Fresno, following

24    his conviction by jury trial on December 20, 2007, of two counts of first degree murder.

25    With regard to the charges, Petitioner was found to have personally and intentionally

26    discharged a firearm to cause death, that the murder was committed in the commission

27    of a robbery, and that multiple murders occurred. On February 26, 2008, Petitioner was

28    sentenced to life without the possibility of parole plus forty-five (45) years. (Clerk's Tr. at

685-86.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, which was denied on January 16, 2009. (Lodged Docs. 24-26; Answer, Ex. A.) Petitioner filed a petition for review with the California Supreme Court which was summarily denied on January 21, 2010. (Lodged Doc. 28.)

Petitioner filed his federal habeas petition on February 14, 2011. (Pet., ECF No. 1.) The petition raised three grounds for relief: 1) Petitioner's Sixth Amendment right to cross-examine witness was violated by introducing recorded testimony of other co-defendants; 2) Petitioner's Fifth and Fourteenth Amendment rights were violated based on insufficient evidence; and 3) cumulative error relating to accomplice testimony.

Respondent filed an answer to the petition on September 16, 2011. (Answer, ECF No. 16.) Petitioner did not file a traverse.

## II.   STATEMENT OF THE FACTS[1]

In 2006, Lee Cha and his wife lived in Merced where, until being laid off, Cha worked as an automobile mechanic in his brother Tong Cha's repair shop. In May of 2006, Cha asked Doua Xiong, a relative, if he knew anyone who might know of a mountain location where Cha could plant marijuana. A few weeks later, Cha asked Xiong if he knew anyone who sold marijuana and cocaine. During the conversation, Cha stated that he wanted to purchase methamphetamine to sell in Alaska.

In June of 2006, Xiong went to his cousin Kou Heng Lee's house in Fresno. Lee was addicted to crystal methamphetamine and smoked about $ 50 to $ 75 worth of methamphetamine daily. Lee supported his addiction by selling stolen goods and crystal methamphetamine.

Xiong told Lee that Cha was interested in purchasing drugs and asked Lee if he knew where to buy them. Lee stated that he did. Xiong gave Lee and Cha each others' phone numbers.

The next day, Cha telephoned Lee and said he wanted to buy a large amount of crystal methamphetamine but first wanted samples of the drug, for which he agreed to pay $ 200. Lee told Cha that Cha would have to buy the drugs from a direct source.

A week later, Lee called Cha and told him he had obtained samples of two different types of crystal methamphetamine. Lee and Debra Mercy

---

[1] The Fifth District Court of Appeal's summary of the facts in its October 20, 2009 opinion is presumed correct.  28 U.S.C. § 2254(e)(1).

Bacud, a friend and fellow drug user, drove Bacud's car to meet Cha in a FoodMaxx parking lot in Fresno. Lee gave "half an eight ball" of methamphetamine to Cha, and Cha gave Lee $ 100.

Two days later, Cha telephoned Lee and said he wanted to purchase two pounds of crystal methamphetamine. Lee told Cha the drugs would cost $ 10,000 per pound, but Cha said he did not want to pay that much.

Lee was not able to obtain the methamphetamine and decided to sell Cha "bad dope," containing no methamphetamine, instead. Bacud told Lee that her boyfriend, Damian Anthony Vasquez, could obtain the "bad dope." Lee then met with Vasquez, who stated he had a friend who could get Lee two pounds of "bad dope" and Lee would pay for the drugs later. The next day, Lee telephoned Cha and told him the drugs would cost $ 8,000 per pound. Cha agreed to that price and said he would let Lee know when he was ready to complete the purchase.

Lee then called Xiong and asked if Cha was an undercover police officer, but Xiong said that Cha was his cousin and that he had been a mechanic.

On July 24, 2006, Cha telephoned Lee and told him he was ready to purchase the drugs. That night, Lee met with Vasquez and Bacud at a motel to discuss finding someone who would act as a "connection," someone who would take the blame for the "bad dope." Lee telephoned his friend, Her, who came to the motel with appellant and Mario Adrian Calderon, and met with Lee, Vasquez, and Bacud. Lee told Her he would pay him $ 1,000 for acting as a fake connection and for selling the "bad dope," and Lee also agreed to give Vasquez, Bacud, and appellant each $ 1,000.

On July 26, 2006, Cha telephoned Lee and said he would be coming to Fresno to buy the drugs. Lee telephoned Vasquez, who said he would pick up the drugs. Cha later telephoned Lee to say he was almost in Fresno. Bacud picked up Lee and they met Vasquez at his mother's house, but Vasquez did not have the fake drugs.

When Cha telephoned Lee and said he was in Fresno, Lee told Cha he first wanted to see the money. Cha agreed to show him the money and stated that his brother would be with him. Lee, Bacud and Vasquez drove to meet Cha. They drove Vasquez's mother's Lexus "[t]o make it look good," and picked up appellant for "protection."

Lee and appellant met Cha and his brother on a side street near FoodMaxx. Cha got into the Lexus and showed Lee the money, which was in a brown envelope. Lee phoned Vasquez and told him to pick up the drugs. Cha went back to his car.

Lee and appellant drove to Lee's house, where they picked up two loaded guns, a nine-millimeter and a .32-caliber. Lee gave appellant the .32-caliber gun. Lee and appellant then met Vasquez and Bacud in a grocery store parking lot. A couple of minutes later, Her and Calderon arrived in Her's car.

Lee got the fake drugs from Vasquez, gave them to Her, and told

3

1   Her to find a spot to meet near Kearney Park and then wait for him and
    Cha. Her and Calderon left in Her's car. Vasquez and Bacud also left.

2
        Lee returned to the Lexus and telephoned Cha, who stated he was
3   at an Asian market in Fresno. Lee and appellant drove to the store parking
    lot where Lee got out of the car and spoke to Cha. Appellant went into the
4   market to get something to eat. Cha pointed to Torn Saetern, who was in
    another vehicle, and stated that he was the one who was going to buy the
5   drugs. Cha told Lee he was going to sell the drugs to Saetern for a lot
    more and asked that Lee not say anything about the price. Cha would
6   then give Lee a "back cut" of $ 1,000 once the deal was done. Lee
    returned to the Lexus and telephoned Her, who stated that he was still
7   looking for a place and would call when he found a good spot.

8       Cha's brother exited the market and walked to Cha's car, where
    Cha told his brother he was going with Lee. Cha's brother did not want
9   Cha to go with Lee because they did not know him, but Cha said that Lee
    was related to Xiong.

10      Lee and appellant drove towards Kearney Park and discussed the
    presence of the third man (Saetern) who was with Cha. They thought it
11  was suspicious that Cha had not previously mentioned him. Cha and his
    brother followed the Lexus in Cha's car. Saetern followed in his vehicle.
12  Cha telephoned Lee and asked if it would be better if they all traveled in
    one car. Lee agreed and directed the group to drive to FoodMaxx, where
13  they would get into one car.

14      En route to FoodMaxx, Lee telephoned Her and told him Cha had
    two cars and three people. Her informed Lee that he was armed and that
15  the fake drugs looked like "[a] big chunk of chalk wrapped in a plastic
    bag." Since Her did not know if the fake drugs would pass for real drugs,
16  Lee decided they would just rob Cha and Saetern instead. Lee informed
    appellant of this decision, and appellant agreed. Lee telephoned Her and
17  informed him of their change in plans.

18      Once at the FoodMaxx parking lot, Cha, his brother, and Saetern all
    got into the Lexus. Cha's brother then decided to return to Merced
19  because he had to go back to work. He was suspicious of Lee and
    appellant, and the Lexus did not have a front license plate, which he also
20  thought was suspicious. As Cha's brother stepped out of the Lexus, he
    noticed a gun between Lee's legs. Cha's brother drove Saetern's vehicle
21  back to Merced while Lee, appellant, Cha, and Saetern drove away in the
    Lexus. Cha left his vehicle in the FoodMaxx parking lot. Cha's brother
22  wrote down the license plate number of the Lexus as Lee, appellant, Cha,
    and Saetern drove off.
23
        Lee drove the four toward Kearney Park. When Lee spotted Her's
24  car on a dirt road on the north side of Kearney Boulevard, Lee turned onto
    the dirt road and parked near Her. Calderon was in the passenger seat of
25  Her's car. Lee told Cha and Saetern that Her was the "connection."

26      The four men got out of the Lexus, and Her got out of his vehicle.
    Calderon stayed in the car. As Lee walked toward Her's car, Cha told Lee
27  that his brother had the money but he need not worry as he would give
    Lee the money once they got back.
28

4

Lee and Cha continued toward Her's car to look at the drugs. Saetern looked into Her's car at the drugs, walked to the middle of the road, and began to make a phone call. Appellant stood next to Saetern in the middle of the road; Cha was next to Saetern, who stood in front of Lee, with his back to Lee. Lee pulled out a gun and fired three shots from his nine-millimeter gun into Cha's back. Her then fired his gun at Cha from behind his car. At the same time, appellant shot Saetern in the head.

Both Cha and Saetern fell to the ground. Her then drove away. Lee took Cha's wallet from his pocket and Cha and Saetern's cell phones. Lee and appellant then left the scene and drove to Vasquez's house, where they told Vasquez and Bacud that they had shot Cha and Saetern and that there was no money.

Lee later told Vasquez that he was going to rob Cha and Saetern, but that he shot them instead. Lee checked the number of bullets in his nine-millimeter gun and found that three rounds were missing.

Lee telephoned Her and told him to come to Vasquez's house. Her and Calderon arrived and brought the "bad dope" with them. The group discussed the murders and whether anybody found the money. Lee told the group not to say anything and to "[j]ust forget about it." When the group disbanded, Lee gave Cha's wallet to Bacud. He left the "bad dope" at Vasquez's house. Lee put the stolen cell phones in a desk on his front porch.

About two days after the murders, Lee told Her to drop his gun off so that Lee could sell it for him. Lee later sold both guns used during the murders for another nine-millimeter gun and $ 200. He put the new gun under a drawer at his house.

In the meantime, at approximately 6:00 a.m. on July 27, 2006, an almond farmer discovered the bodies of Cha and Saetern near the intersection of Kearney Boulevard and Hayes Avenue. Police subsequently discovered $ 3,800 in cash in Cha's sock and $ 16,000 in cash in a brown envelope in the small of his back under his shirt. They found $ 40 in Saetern's back pants pocket. Six expended .32 automatic cartridge casings and three nine-millimeter Luger cartridge casings were found near the bodies.

Also at about 6:00 that morning, Cha's wife telephoned Xiong and told him that Cha and another man had left the day before about 4:00 p.m. and had not returned. Xiong gave Cha's wife Lee's telephone number but, when Cha's wife called, no one answered.

Xiong also telephoned Lee but got no answer. Xiong and his father went to Lee's house several times, but Lee was not there. After the last try, as Xiong and his father drove away, Lee telephoned Xiong and told him to stop looking for him and that "the Mexicans" would not let him move. Xiong asked where Cha and Saetern were, and Lee said he did not know.

During a second conversation with Xiong, Lee asked that Xiong telephone him and use a fake name so that "the Mexicans" would release him. Xiong telephoned Lee, but Lee did not answer. At 2:50 p.m., Lee sent Xiong a text message asking where he was and stated he was stuck. The

message also said, "UMUST not say nothing. N don't go 2 my  [13] house at all. PLEASE DON'T."

Cha's brother told police that he had been with Cha and Saetern the day before in Fresno and that Cha and Saetern went with two people in a white Lexus. He gave the officers the license number of the Lexus. Cha's brother told officers he had received a call from Cha's cellular phone shortly after he saw them drive away but, when he answered, no one responded and he heard voices speaking in Hmong and a loud "bang, bang."

Police contacted Cha's wife, who stated that Cha drove to Fresno the previous day at 4:00 p.m. and that Xiong told her Cha had gone to buy drugs from Lee.

The following day, July 28, 2006, Xiong told officers about his conversations with Lee and Cha; that Cha had asked if he knew anyone who sold methamphetamine; that Xiong had exchanged the names and phone numbers between Cha and Lee; and that Xiong had gone to Lee's house several times the previous day because Cha's wife had told him Cha was missing. Xiong showed police the text message he had received from Lee.

Vasquez's father was identified as the registered owner of the Lexus. Vasquez's father told officers that his wife, who lived at a different address, drove the Lexus and that she had been out of town between July 25 and July 27.

Police subsequently interviewed Vasquez on August 1, 2006. Vasquez stated that he had driven the Lexus on July 25 to meet Lee at a friend's house. The following day, July 26, Lee borrowed the Lexus for between one and a half to three hours. Vasquez stated that he was present when Lee discussed a drug deal at his house.

On August 2, 2006, police executed a search warrant for Lee's residence. Police found a firearm on the floor under the dresser in Lee's bedroom closet, a box of live nine-millimeter ammunition, a piece of paper containing Cha's name and cell phone number, three cell phones in a drawer of a dresser or desk on the front porch, and a plastic grocery bag containing a white, rocky, powdery substance, which was later discovered to contain no controlled substance and weighed a little less than a pound.

Police interviewed Lee shortly while the search warrant was being executed. After telling officers several versions of the events, he stated he wanted "to make a deal" and told officers that he, Calderon, Her, and appellant were at the murder scene. Lee told officers that he called Her because he needed somebody to pose as the drug dealer. Lee stated that he met with Vasquez, Bacud, Her, Calderon, and appellant at a motel to discuss the drug deal. The group decided to carry firearms for protection and discussed having to shoot someone "for the money." Lee told officers he shot Cha three times with a nine-millimeter, appellant fired a .32-caliber, and Her fired a nine-millimeter. Lee was arrested for the murders at the end of the interview.

On August 4, 2006, officers arrested appellant, Her, and Calderon at Her's house. Her was interviewed that same day. After first claiming that

6

he was fishing on the day of the murders, he then admitted that he met with "Jesse" and Lee on July 25 and agreed to participate in a drug deal. Later that night, "Jesse" gave him a package containing two pounds of methamphetamine. Her said he transported the drugs to Kearney Park on July 26, but that the victims were dead when he arrived at the scene. He then changed his story and stated that he was on his way to Kearney Park when he saw Lee in a nice, gray-colored, newer vehicle. Lee signaled Her to pull over. A red Honda Civic was also at the location, but drove away. The gray vehicle then dropped off two Asian males, who were shot while Her sat in his car.

Her then stated the red car was not at the scene; he was in his car with the drugs between the seats; the gray vehicle drove in behind him; two Asian males got out of the vehicle and walked over to his vehicle to look at the drugs. Her claimed he heard the Asian men talking in Hmong about robbing them for the drugs. Her telephoned Lee, who was still in the gray car, and warned him. Lee got out of the car. As Her started to get out of his car, he reached for a .22-caliber pistol under his shirt. Her then heard 10 to 12 shots being fired at the men. Her saw one of the men fall and heard the victim's weapon fall to the ground. He picked up the victim's gun, a black semiautomatic nine-millimeter handgun, and shot the victim three or four times in the torso. He thought the victim was already dead when he did so. Her denied intending to rob or kill anyone and then explained that he was armed because it was dangerous to do a drug deal.

Officers transported Her to the murder scene, where he described the events leading up to the murders. Her directed the police to a location where he claimed he threw the gun into the canal, but a subsequent dive team was unable to find the gun. Calderon confirmed the approximate location where Her threw the gun into the canal.

Appellant also was interviewed by officers on August 4, 2006. He denied any knowledge of the murders. When asked what had happened, appellant stated that the police already knew "the story" because "somebody got a big mouth."

Calderon was reinterviewed on August 9, 2004. He initially denied involvement in the murders but admitted knowing there was going to be a drug deal on Kearney Boulevard involving "fake dope" in order to "rip-off" the victims for the money. Calderon stated he was a passenger in a black Honda Civic during the murders and that the drugs were between the seats in the car. Calderon said, "'I saw two dudes get shot over some dope … over what was supposed to be a deal to rob two guys … using fake dope.'" He denied getting out of the car during the killings.

That same day, officers arrested Bacud. Cha's vehicle insurance card was in Bacud's purse, and Lee's telephone number and items containing Cha's name were inside her computer bag. Appellant's fingerprints were found on several of the articles.

Officers interviewed Bacud, who first denied any knowledge of the murders. She then stated that she overheard a conversation the night before the murders regarding a drug deal of two and a half pounds of methamphetamine, but she denied involvement. Bacud stated that, after the murders, Lee told her he had been involved in "something real bad" and he had shot someone. He later gave her some credit cards and a

driver's license belonging to Cha.

An autopsy conducted on Cha concluded that he died of multiple gunshot wounds. Saetern died of a gunshot wound to the head. The gunshot wounds to both Cha and Saetern were caused by large caliber bullets.

Testing later revealed that five of the six .32 automatic cartridge casings found at the scene were fired from the same firearm. There was insufficient information to determine whether the sixth .32 automatic cartridge casing was fired from that same firearm. The three nine-millimeter Luger cartridge casings found at the scene were fired from the same nine-millimeter firearm, but were not fired from the Luger nine-millimeter firearm seized from Lee's home. It was also determined that three of four bullets found at the scene were not fired from the weapon seized at Lee's house, and testing on the fourth bullet fragment was inconclusive.

At trial, Lee claimed he was under the influence of methamphetamine when he committed the murders.

Cha's brother testified that, on the evening of July 26, 2006, after Cha, Saetern, and two others left the FoodMaxx parking lot in the Lexus, he received a telephone call from Saetern, but no one responded when he answered the phone. Instead, Cha's brother heard people talking in Spanish, laughing, a car door open and shut, and two gunshots. The call ended after nine minutes. Later that night, Cha's brother drove back to the FoodMaxx parking lot and found Cha's car still there.

Cha's brother testified that he had not given certain information to the police because he was fearful of the codefendants' relatives.

People v. Soria, 2009 Cal. App. Unpub. LEXIS 377, 2-3 (Cal. App., Jan. 16, 2009).

## II.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.   Legal Standard of Review

8

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.   Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

9

(or principles) to the issue before the state court. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." <u>Id.</u> at 75-76, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002). In <u>Harrington v. Richter</u>, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419 (2009), quoted by <u>Richter</u>, 131 S. Ct. at 786.

2.   <u>Review of State Decisions</u>

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption. <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198 (9th Cir. 2006).   Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

1    Richter instructs that whether the state court decision is reasoned and explained,

2    or merely a summary denial, the approach to evaluating unreasonableness under §

3    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

4    or theories supported or, as here, could have supported, the state court's decision; then

5    it must ask whether it is possible fairminded jurists could disagree that those arguments

6    or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

7    Thus, "even a strong case for relief does not mean the state court's contrary conclusion

8    was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).   AEDPA "preserves

9    authority to issue the writ in cases where there is no possibility fairminded jurists could

10   disagree that the state court's decision conflicts with this Court's precedents." Id.  To put

11   it yet another way:

12           As a condition for obtaining habeas corpus relief from a federal
             court, a state prisoner must show that the state court's ruling on the claim
13           being presented in federal court was so lacking in justification that there
             was an error well understood and comprehended in existing law beyond
14           any possibility for fairminded disagreement.

15   Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

16   are the principal forum for asserting constitutional challenges to state convictions." Id. at

17   787. It follows from this consideration that § 2254(d) "complements the exhaustion

18   requirement and the doctrine of procedural bar to ensure that state proceedings are the

19   central process, not just a preliminary step for later federal habeas proceedings."   Id.

20   (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

21                  3.    Prejudicial Impact of Constitutional Error

22           The prejudicial impact of any constitutional error is assessed by asking whether

23   the error had "a substantial and injurious effect or influence in determining the jury's

24   verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

25   U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

26   state court recognized the error and reviewed it for harmlessness).  Some constitutional

27   errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

28   Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

(1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the <u>Strickland</u> prejudice standard is applied and courts do not engage in a separate analysis applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918, n. 7 (2002).  <u>Musalin v. Lamarque</u>, 555 F.3d at 834.

## III.    REVIEW OF PETITION

### A.    Claim One: Violation of Confrontation Clause

Petitioner contends that he was denied his Sixth Amendment right to confront and cross-examine witnesses as the trial court admitted testimony in the form of taped conversations with police officers. (Pet. at 4.)

### 2.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. (<u>See</u> Answer, Ex. A, Lodged Doc. 28.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); <u>see also</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

**1.    Admission of Hearsay Statements of the Nontestifying Codefendants and Right to Confrontation and Cross-examination**

By way of pretrial in limine motions, defense counsel for appellant and for the codefendants made <u>Aranda</u>/<u>Bruton</u> objections to the

prosecutor's predicted use of the hearsay statements given by each. Pointing out the difficulties in redacting lengthy statements by appellant, Vasquez, Calderon, Bacud and Her in order to comply with <u>Aranda</u>/<u>Bruton</u> concerns (<u>see</u> post), the prosecutor proposed to control the flow of the evidence by having the officers who took the statements testify to admissible portions of the statements rather than introducing redacted transcripts or tape recordings of the statements themselves. Counsel for appellant, as well as counsel for the codefendants, argued against this procedure because it would result in unpredictability and unintended <u>Aranda</u>/<u>Bruton</u> error. The trial court's solution was to require the prosecution to make offers of proof. When the prosecutor noted that defense counsel would have the actual statements to use in cross-examining the officers, counsel for appellant argued that, because of <u>Aranda</u>/<u>Bruton</u> concerns, "our Sixth Amendment right to cross-examination would [nonetheless] be restricted and constricted by that procedure." The trial court responded, however, that such restriction would be present, too, if redacted statements were used rather than tailored testimony from the officers.

Thereafter, officers did testify to hearsay statements made by appellant and each of the codefendants. The trial court gave a limiting instruction informing the jury that the nontestifying parties' statements could be used only as to the declarants. During deliberations, the jury requested it be provided with the actual statements. The trial court denied the request because the actual statements had not been placed in evidence.

Appellant now claims this resulted in error in the following ways. First, the testimony of the officers was insufficiently tailored (redacted, if you will) to avoid <u>Aranda</u>/<u>Bruton</u> error. Second, the trial court abused its discretion and denied appellant's "constitutional right to due process, confrontation and adequate cross-examination" by "choosing one constitutional right [<u>Aranda</u>/<u>Bruton</u>] over another [cross-examination]." We disagree.

## A. No <u>Aranda</u>/<u>Bruton</u> Error Occurred

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that in criminal prosecutions, the defendant has the right to be confronted with the witnesses against him. (U.S. Const., 6th Amend.) The Sixth Amendment right to confrontation includes the right of cross-examination. (<u>Pointer v. Texas</u> (1965) 380 U.S. 400, 404; <u>People v. Fletcher</u> (1996) 13 Cal.4th 451, 455.)

"A recurring problem in the application of the right of confrontation concerns an out-of-court confession of one defendant that incriminates not only that defendant but another defendant jointly charged. Generally, the confession will be admissible in evidence against the defendant who made it (the declarant). (<u>See</u> Evid. Code, § 1220 [hearsay exception for party admission].) But, unless the declarant submits to cross-examination by the other defendant (the nondeclarant), admission of the confession against the nondeclarant is generally barred both by the hearsay rule (Evid. Code, § 1200) and by the confrontation clause (U.S. Const., 6th Amend.)." (<u>People v. Fletcher</u>, supra, 13 Cal.4th at p. 455, fn. omitted.)

The <u>Aranda</u>/<u>Bruton</u> rule addresses the confrontation clause issues raised by the introduction of a defendant's out-of-court statement in a joint trial with one or more codefendants. In <u>Aranda</u>, the California Supreme Court articulated a rule of criminal procedure prohibiting the introduction of a nontestifying codefendant's extrajudicial statement that directly or inferentially implicates a jointly tried defendant, unless the statement is redacted to eliminate the direct or inferential reference to the defendant. (<u>Aranda</u>, supra, 63 Cal.2d at pp. 528-531.) <u>Aranda</u> held the admission of a nontestifying codefendant's out-of-court confession, which inculpates the defendant, is not rendered harmless by a jury instruction that the evidence should not be considered against that defendant. (<u>Id.</u> at p. 526.) Instead, if the defendants are tried together, either the statement must be redacted to remove direct and indirect identification of the defendant, or it must be excluded altogether. (<u>Id.</u> at pp. 530-531.)

In <u>Bruton</u>, the United States Supreme Court held that a defendant's constitutional right to confrontation of the witnesses against him is violated by admitting the confession of a nontestifying codefendant that names and incriminates the defendant. This is so even though the jury is instructed to disregard the confession in determining the nondeclarant defendant's guilt or innocence. (<u>Bruton</u>, supra, 391 U.S. at pp. 135-137.)

<u>Bruton</u>'s scope was limited in <u>Richardson v. Marsh</u> (1987) 481 U.S. 200, where the court held that, when a nontestifying codefendant's confession is redacted so that it does not facially incriminate the defendant, the admission of the statement with a proper limiting instruction will not violate the confrontation clause. (<u>Id.</u> at pp. 207-208, 211.) Richardson distinguished the confession in that case from the confession in <u>Bruton</u>:

"In <u>Bruton</u>, the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice. [Citation.] Thus, at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.' [Citation.] By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." (<u>Richardson v. Marsh</u>, supra, 481 U.S. at p. 208, fn. omitted.) Under such circumstances, the court could properly presume that jurors would follow a limiting instruction not to consider the confession against the defendant, even if the confession incriminated the defendant when considered in connection with other evidence. (<u>Id.</u> at pp. 201-202, 208.)

**1. Vasquez's statements**

Appellant challenges various statements made by Vasquez during his interview with Deputy Chapman, and related to the jury by Chapman, on the basis they were insufficiently redacted and thus violated the <u>Aranda</u>/<u>Bruton</u> rule: (1) on July 26, Vasquez left the house for awhile, returned home, and "had company"; (2) the "company" left and then returned later that night; (3) Lee borrowed Vasquez's family's Lexus for one and a half to three hours on July 26; (4) there was a discussion about a drug deal, and Lee was "one of the individuals" present for that discussion.

No <u>Aranda</u>/<u>Bruton</u> error occurred here. While <u>Aranda</u>/<u>Bruton</u> forbids the admission of statements made by a nontestifying codefendant that

14

incriminate the defendant (<u>Bruton</u>, supra, 391 U.S. at pp. 126, 135-136; <u>Aranda</u>, supra, 63 Cal.2d at pp. 529-530), Vazquez's reference to "company" and to a discussion of a drug deal did not implicate appellant in the criminal activity. It is only through consideration of other evidence that the jury could infer Vasquez's "company" included appellant. (<u>See Richardson v. Marsh</u>, supra, 481 U.S. at pp. 208, 211; <u>Gray v. Maryland</u> (1998) 523 U.S. 185, 192-196.) Under <u>Richardson</u>, any potential infringement of appellant's rights was prevented because the trial court gave a limiting instruction.

**2. Calderon's statements**

Appellant challenges statements by Calderon, made during his interview with Deputy Chapman and related to the jury by Chapman: (1) Calderon stated he had been present during a discussion about a drug deal but denied any involvement, (2) Calderon admitted he was present at the scene of the murders after arriving in a black Honda Civic. Again, we find no <u>Aranda</u>/<u>Bruton</u> error as Calderon's statement did not incriminate appellant in the criminal activity. (<u>Cf. People v. Olguin</u> (1994) 31 Cal.App.4th 1355, 1374-1375.)

We also reject appellant's claim that Vasquez's counsel's reference to Calderon's interview as being 89 pages long was <u>Aranda</u>/<u>Bruton</u> error. The reference was not a statement by a nontestifying codefendant and did not incriminate appellant.

**3. Bacud's statement**

We similarly reject appellant's claim of <u>Aranda</u>/<u>Bruton</u> error relating to the challenged statement by Bacud during her interview by Deputy Toscano, and related to the jury by Toscano: The night before the murders, she overheard a conversation regarding a drug deal that was going to occur, but she had no involvement or knowledge of the actual deal. Bacud's statement did not itself implicate appellant in any criminal activity. (<u>Bruton</u>, supra, 391 U.S. at pp. 126, 135-136; <u>Aranda</u>, supra, 63 Cal.2d at pp. 529-530.)

**4. Her's statement**

We also reject appellant's claim of <u>Aranda</u>/<u>Bruton</u> error to the challenged statement made by Her. Her's statement, made during his interview with Detective Eaton, and related to the jury by Eaton, was that Her was present during a conversation about drugs. Her's statement did not implicate appellant in any criminal activity. (<u>Bruton</u>, supra, 391 U.S. at pp. 126, 135-136; <u>Aranda</u>, supra, 63 Cal.2d at pp. 529-530.)

**5. Appellant's statement**

Appellant's statement to Detective Eaton, related to the jury by Eaton, was brief: He denied any knowledge about the homicide, but the detectives already knew the story anyway because "somebody got a big mouth." Use of appellant's statement against him did not violate the <u>Aranda</u>/<u>Bruton</u> rule, which limits the use of statements made by nontestifying codefendants. (<u>Bruton</u>, supra, 391 U.S. at pp. 126, 135-137; <u>Aranda</u>, supra, 63 Cal.2d at pp. 528-531.)

15

**B. No Crawford Error Occurred**

Appellant contends he was denied his right to confrontation and cross-examination in violation of the principles enunciated in Crawford v. Washington (2004) 541 U.S. 36. He argues, in effect, that Crawford undermines the Aranda/Bruton rule. Crawford error occurred, according to appellant, because, although defense counsel cross-examined the police officers regarding his and his codefendants' statements, defense counsel was prevented from full cross-examination. Appellant points to nothing specific, but states counsel should have been able to question on "portions of his own statement that may have helped his case by demonstrating the context of the statements" and his codefendants statements to show that their statements "lacked credibility." In Crawford, the United States Supreme Court expanded a defendant's confrontation rights by holding that an out-of-court "testimonial" statement offered against the accused is inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine that declarant. (Crawford v. Washington, supra, 541 U.S. at pp. 68-69.) There is no dispute that a statement elicited during a police interrogation is testimonial. (Ibid.; see also People v. Song (2004) 124 Cal.App.4th 973, 982.)

But Crawford does not overrule Bruton and its progeny. That Vasquez, Calderon, Bacud, and Her's statements were "testimonial" under Crawford does not help appellant because the statements did not incriminate him, and the jury was instructed that the statements could not be used against him. When a statement is properly redacted and the jury is instructed not to use it against the defendant, as occurred here, the declarant is not a "witness[] against" the defendant, and the statement does not implicate the confrontation clause. (U.S. Const., 6th Amend.) The same redaction that prevents Aranda/Bruton error also prevents Crawford error. (People v. Stevens (2007) 41 Cal.4th 182, 199; People v. Song, supra, 124 Cal.App.4th at pp. 983-984.)

People v. Vang, 2009 Cal. App. Unpub. LEXIS 8324 at 19-29.

### 3.   Legal Standard

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corrections for California, 692 F.3d 910 (9th Cir. 2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial"

1    in nature unless the witness is unavailable and the defendant had a prior opportunity to

2    cross-examine the witness, regardless of whether such statements are deemed reliable.

3    Crawford v. Washington, 541 U.S. 36 (2004). The Crawford rule applies only to hearsay

4    statements that are "testimonial" and does not bar the admission of non-testimonial

5    hearsay statements. Id. at 42, 51, 68. See also Whorton v. Bockting, 549 U.S. 406, 420

6    (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial

7    statement.").

8          Although the Crawford court declined to provide a comprehensive definition of the

9    term "testimonial," it stated that "[s]tatements taken by police officers in the course of

10   interrogations are . . . testimonial under even a narrow standard." Crawford, 541 U.S. at

11   52. The court also provided the following "formulations" of a "core class" of testimonial

12   statements: (1) "ex parte in-court testimony or its functional equivalent - that is, material

13   such as affidavits, custodial examinations, prior testimony that the defendant was unable

14   to cross-examine, or similar pretrial statements that declarants would reasonably expect

15   to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized

16   testimonial materials, such as affidavits, depositions, prior testimony, or confessions;"

17   and (3) "statements that were made under circumstances which would lead an objective

18   witness reasonably to believe that the statement would be available for use at a later

19   trial." Id. at 51-52. The court in Crawford also pointed out that the Sixth Amendment

20   Confrontation Clause "does not bar the use of testimonial statements for purposes other

21   than establishing the truth of the matter asserted." Id. at 59, n.9. However, "state

22   evidence rules do not trump a defendant's constitutional right to confrontation," and a

23   reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate,

24   nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the

25   Confrontation Clause's application." (citation omitted). Williams v. Illinois,    U.S.   , 132

26   S.Ct. 2221, 2226, 183 L. Ed. 2d 89 (2012).

27         In Bruton v. United States, 391 U.S. 123 (1968), the case relied on by Petitioner,

28   the Supreme Court held that a defendant is deprived of his Sixth Amendment right of

17

1    confrontation when a facially incriminating confession of a non-testifying co-defendant is

2    introduced at their joint trial, even if the jury is instructed to consider the confession only

3    against the co-defendant. 391 U.S. at 135. "Under Bruton and its progeny 'the admission

4    of a statement made by a non-testifying codefendant violates the Confrontation Clause

5    when that statement facially, expressly, or powerfully implicates the defendant.'" United

6    States v. Hernandez-Orellana, 539 F.3d 994, 1001 (9th Cir. 2008) (quoting United States

7    v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007)). However, after the issuance of the

8    Crawford decision, "[i]t is . . . necessary to view Bruton through the lens of Crawford,"

9    and "the threshold question in every case is whether the challenged statement is

10   testimonial. If it is not, the Confrontation Clause 'has no application.'" United States v.

11   Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010). Accordingly, the rule set forth in

12   Bruton, which is premised on the Confrontation Clause, does not apply to statements

13   which are non-testimonial. United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009)

14   ("Because it is premised on the Confrontation Clause, the Bruton rule, like the

15   Confrontation Clause itself, does not apply to nontestimonial statements."). See also

16   Fernandez v. Adams, No. CV 08-3544 PSG (JC), 2011 U.S. Dist. LEXIS 38662, 2011

17   WL 1344520, *19 n.23 (C.D. Cal. Mar. 1, 2011) (petitioner's Confrontation Clause claim

18   "fails to the extent it is intended to be separately predicated upon Bruton.").

19          Further, Confrontation Clause violations are subject to harmless error analysis.

20   Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of

21   habeas petitions, the standard of review is whether a given error 'had substantial and

22   injurious effect or influence in determining the jury's verdict.'" Christian v. Rhode, 41 F.3d

23   461, 468 (9th Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

24   Factors to be considered when assessing the harmlessness of a Confrontation Clause

25   violation include the importance of the testimony, whether the testimony was cumulative,

26   the presence or absence of evidence corroborating or contradicting the testimony, the

27   extent of cross-examination permitted, and the overall strength of the prosecution's case.

28   Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

4.    Analysis

With these standards in mind and after a careful review of the record, this Court concludes that Petitioner's Confrontation Clause claim lacks merit and must be denied. The Court presumes for purposes of its analysis that the factual determinations of the California Court of Appeal with regard to Petitioner's Confrontation Clause claims are correct. See 28 U.S.C. § 2254(e)(1). Here, the statements at issue by Petitioner's co-defendants were made during interviews with police. Even under the narrowest interpretation, statements made during police interrogation are testimonial and subject to the Confrontation Clause. See Crawford, 541 U.S. at 52.  The state court held that the statements did not violate the Aranda/Bruton rule because the statements did not incriminate Petitioner, and if they did, the jurors were instructed not to consider the confession of other co-defendants against defendant. In its description of each of the co-defendant's statements, the state court notes that most of them only refer to the fact that the co-defendant was a part of a conversation or overheard a conversation regarding a drug deal. The statements did not mention who was taking part in the conversation regarding the drug deal.  At no point was Petitioner named as a participant. The most allegedly incriminating testimony was that of co-defendant Vasquez who stated to law enforcement that he "had company" over, and that the jury could infer, through the use of other evidence, that the "company" included Petitioner. People v. Vang, 2009 Cal. App. Unpub. LEXIS 8324, 19-29.

This Court agrees that the statements attributed to Petitioner's co-defendants do not "facially, expressly, or powerfully implicate" Petitioner in the alleged criminal act. See United States v. Hernandez-Orellana, 539 F.3d at 1001. While the jury could infer from the statements that Petitioner was involved in the conversation from the drug deal, none of the statements affirmatively placed him there. Only inference and implication could a cause one to conclude Petitioner was present at the conversation. Furthermore, even if the evidence created such an inference, the jurors are assumed to have followed the jury instructions to not use co-defendats' incriminatory statements of against Petitioner.

With regard to Petitioner's own statements to Detective Eaton, the state court found that Petitioner did not present specific evidence that his right to cross-examine Detective Eaton was denied. Petitioner has presented no arguments in his federal petition regarding this claim, and it must likewise be denied.

The decision of the California courts denying Petitioner's claim under the Confrontation Clause is not contrary to or an unreasonable application of federal law. Accordingly, Petitioner is not entitled to relief on this claim.

**B.    Claim Two: Insufficient Evidence**

Petitioner claims that his due process rights were violated because there was insufficient evidence to show that he intended to rob the victims before the murder. (Pet. at 4.)

1.    State Decision

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

> **2. Sufficient Evidence of First Degree Felony Murder and the Robbery Special Circumstance**
>
> Appellant contends the evidence was insufficient to prove first degree murder on a robbery or attempted robbery-felony-murder theory, or to prove the special circumstance findings that he murdered the victims during the commission or attempted commission of a robbery, because the only evidence of his participation in a robbery or attempted robbery was the accomplice testimony of Lee, which was not adequately corroborated. We reject appellant's contention.
>
> When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (People v. Valdez (2004) 32 Cal.4th 73, 104.) When reviewing the sufficiency of the evidence to support a special circumstance, the relevant inquiry is "'whether, after viewing the evidence in the light most favorable to the People, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.'" (People v. Alvarez (1996) 14 Cal.4th 155, 225, quoting People v. Mickey (1991) 54 Cal.3d 612, 678, fn. omitted.) We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. (People v. Ramirez (2006) 39 Cal.4th 398, 463.) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might

also reasonably be reconciled with a contrary finding. (People v. Valdez, supra, at p. 104.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (People v. Guerra (2006) 37 Cal.4th 1067, 1129.)

Under the felony-murder rule, a murder "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including robbery, is first degree murder. (§ 189.) The robbery-murder special circumstance applies to a murder "committed while the defendant was engaged in … the commission of, [or] attempted commission of," robbery. (§ 190.2, subd. (a)(17)(A).) "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (People v. Mendoza (2000) 24 Cal.4th 130, 182.) To prove a robbery-murder special circumstance, the prosecution must prove the defendant formed the intent to steal before or while killing the victim. (People v. Valdez, supra, 32 Cal.4th at p. 105.)

To be convicted of attempted robbery, the perpetrator must harbor a specific intent to commit robbery and commit a direct but ineffectual act toward the commission of the crime. (People v. Medina (2007) 41 Cal.4th 685, 694.) The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence. (See People v. Bloom (1989) 48 Cal.3d 1194, 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"].)

Accomplice testimony must be corroborated to supply substantial evidence to support a conviction. (People v. Najera (2008) 43 Cal.4th 1132, 1136-1137.) "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.)

Only slight corroboration is required, however, and the evidence need not corroborate the accomplice as to every fact to which he or she testifies. (People v. Williams (1997) 16 Cal.4th 635, 680-681.)

"The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime." (People v. McDermott (2002) 28 Cal.4th 946, 986; see also People v. Narvaez (2002) 104 Cal.App.4th 1295, 1303.)

Accomplice testimony may not be corroborated by testimony from another accomplice. (People v. Davis (2005) 36 Cal.4th 510, 543.) Also, it is "not sufficient to merely connect a defendant with the accomplice or other persons participating in the crime. The evidence must connect the defendant with the crime, not simply with its perpetrators. [Citations.]" (People v. Falconer (1988) 201 Cal.App.3d 1540, 1543.)

"Accomplice testimony … must be corroborated because it is inherently suspect" in that accomplices usually testify in "'the hope of favor or the expectation of immunity.'" (People v. Narvaez, supra, 104 Cal.App.4th at p. 1304, quoting People v. Coffey (1911) 161 Cal. 433, 438.) The "usual problem" with accomplice testimony is that "'it is consciously self-interested and calculated.'" (People v. Williams (1997) 16 Cal.4th 153, 245, quoting People v. Sully (1991) 53 Cal.3d 1195, 1230.)

Evidence at trial, independent of Lee's testimony, implicates appellant in the murders of Saetern and Cha. Evidence at trial established that Saetern had a bullet entrance wound at the back of his head at the base of his skull and a bullet exit wound on his right cheek. Cha's body sustained five gunshot wounds. An expert testified that a minimum of three firearms fired the bullets. Cartridge casings found at the scene of the murders corroborated Lee's testimony that three persons--Lee, Her, and appellant--all fired on the victims.

Cha's brother testified that he wrote down the license number of the Lexus driven by Lee before Cha and Saetern left with Lee and another individual. After the murders, Vasquez's father was identified as the registered owner of the Lexus, and he testified that Vasquez's mother, who usually drove the vehicle, was out of town at the time of the murders. At trial, Cha's brother was asked to identify the individual who was a passenger in the Lexus with Lee. Cha's brother looked at appellant and stated, "If I'm correct, it's possible that's him right here." The trial court characterized this as a "possible identification" of appellant.

Physical evidence connects appellant to the crimes as well. After the murders, following Bacud's arrest on August 9, 2006, police found items containing Cha's name inside an address book and in a notepad in Bacud's computer bag. Appellant's partial fingerprint was found on a document from the Department of Motor Vehicles containing Cha's name, which was inside the address book.

If it is required, there also is independent corroborating evidence that appellant intended to participate in a robbery of Cha and Saetern. From the ballistics evidence, we know that three of the assailants were armed--circumstantially supporting an intent to rob. From the testimony of Cha's brother, we know that appellant was one of the assailants. When Cha's and Saetern's bodies were discovered, police found $ 3,800 in cash in Cha's sock and $ 16,000 in cash in an envelope under his shirt, providing evidence of a motive and thus corroboration of Lee's testimony and hearsay statement that a robbery was planned. The independent evidence that cell phones and a wallet were taken from the victims was evidence of the taking element of robbery. It also demonstrated at least that the assailants searched the bodies of the victims and, thus, it constituted circumstantial evidence of a previously formed intent to rob.

Various phone records showed several calls between Lee and Her on the evening of July 26, 2006, corroborating Lee's testimony that, with appellant beside him in the car, he called Her several times and discussed the "bad dope" and robbing the victims.

Lastly, the circumstances of the encounter themselves support the theory that a robbery was planned. These include the use of poorly disguised "bad dope" as well as the selection of a remote location for the

crime. While the circumstances of an offense may not be sufficient to corroborate an accomplice, nothing in section 1111 makes the circumstances irrelevant at least so long as other independent evidence corroborates the defendant's participation.

"Corroborative evidence sufficient to satisfy section 1111 need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy a fact finder the accomplice is telling the truth." (People v. Williams, supra, 16 Cal.4th at p. 246.)

Appellant maintains that the corroborating evidence here is not credible, or that there are other explanations for the corroborating evidence. But appellant merely urges this court to reweigh the evidence and indulge in inferences that undermine, rather than support, his convictions. This we will not do.

The authorities appellant cites are distinguishable. In People v. Falconer, several intruders attempted to steal marijuana plants from another person's property. Falconer was the father of one of the intruders. An accomplice testified that Falconer planned and participated in the raid. Nonaccomplice witnesses testified that, months before the raid, Falconer purchased marijuana from the owner of the property. (People v. Falconer, supra, 201 Cal.App.3d at p. 1542.) The court held that the accomplice's testimony was not corroborated because the independent evidence linked Falconer to one of the intruders and to the owner of the property, but not to the crime. (Id. at p. 1543.)

Here, unlike People v. Falconer, there was corroborating evidence that appellant was with the victims and the accomplices when the crimes occurred, bolstered by subsequent ballistic evidence. "[M]ere association with an accomplice in and of itself is insufficient evidence to connect a defendant with a crime [citation], [but] such association when considered in conjunction with other corroborating circumstances has been held to be a factor tending to connect an accused with the commission of the offense." (People v. Moore (1963) 211 Cal.App.2d 585, 594.)

In People v. Robinson (1964) 61 Cal.2d 373, the court found that there was insufficient evidence to corroborate an accomplice's testimony. In Robinson, the defendant's fingerprints were found in a car owned by his cousin, who was also charged with the crime of first degree murder. The car was found at the crime scene. There was additional evidence that the defendant, on the night of the incident, was in the car with his cousin solely to go out to dinner and to see a friend, and they thereafter parted ways. (Id. at pp. 398-399.) The prosecutor argued that the presence of the defendant's fingerprints in the car corroborated an accomplice's testimony that the defendant participated in the crime. (Id. at p. 398.) The California Supreme Court found that the fingerprints "merely placed [the defendant] in the car at some time prior to the time the car was discovered" and were insufficient to connect the defendant to the crime. (Id. at pp. 399-400.)

Here, unlike Robinson, the fingerprint evidence does implicate appellant as there is no evidence otherwise explaining how appellant's fingerprints might have come to be placed on Cha's property. From this evidence it is reasonable to surmise that appellant took the items from Cha or handled them after Lee took them from Cha but before they were

given to Bacud.

And in <u>People v. Martinez</u> (1982) 132 Cal.App.3d 119, the appellate court concluded that there was insufficient corroborating evidence when the testimony of an accomplice identifying the defendant as a robber was supported only by another witness testifying that the defendant's complexion was "exactly like" that of the robber, where that witness also testified, contrary to the accomplice, that the robber had a beard. (<u>Id.</u> at p. 133.) The robbery victim testified that he could not see the defendants during the commission of the crime because it was dark, the perpetrators shone a flashlight into his eyes, and all wore something tied over the lower parts of their faces. (<u>Id.</u> at p. 124.) Other testimony from police officers related merely to "'the commission of the offense or the circumstances thereof,'" and did not connect the defendant to the crime. (<u>Id.</u> at p. 133.) In contrast, corroborating evidence in this case showed appellant's motive for the robbery, placed appellant at the scene of the crime, and supported the identification of appellant as a shooter.

We conclude the record contains substantial evidence supporting the convictions. Bearing in mind that corroborative evidence may be entirely circumstantial (<u>People v. Hayes</u> (1999) 21 Cal.4th 1211, 1271), the corroborating evidence here tended to show both appellant's participation in the murders and an intent on appellant's part to rob the victims: Identification of appellant as the person with Lee in the Lexus placed him at the remote scene of the crime, armed with a firearm; the victims were shot from behind with no indication that they were the aggressors in the crime; there was an incentive to rob the victims, who were carrying a large amount of money; the "bad dope" was poorly disguised, indicating that Lee and the others would have had little hope of a successful "rip-off" and thus may well have planned a robbery alternative.

While none of the corroborating evidence is overwhelming, it does implicate appellant in a plan to rob the men.

"'It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to little weight. It is not necessary to corroborate the accomplice by direct evidence. If the connection of the accused with the alleged crime may be inferred from the corroborating evidence in the case it is sufficient.'" (<u>People v. Rice</u> (1938) 29 Cal.App.2d 614, 619, quoting <u>People v. Yeager</u> (1924) 194 Cal. 452, 473.)

The determination of the trier of fact on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. (<u>People v. McDermott</u>, supra, 28 Cal.4th at p. 986; <u>People v. Narvaez</u>, supra, 104 Cal.App.4th at p. 1303.)

Here the jury's determination is within the bounds of reason and the mandate of section 1111 is satisfied. We reject appellant's contention to the contrary.

<u>People v. Vang</u>, 2009 Cal. App. Unpub. LEXIS 8324 at 29-42.

1          2.   Analysis

2          Petitioner claims his convictions cannot stand because they were supported only

3   by the uncorroborated testimony of accomplices Kow Lee and Tong Cha. However, in

4   federal court "a conviction may be based on the uncorroborated testimony of an

5   accomplice." United States v. Turner, 528 F.2d 143, 161 (9th Cir. 1975); see also

6   Caminetti v. United States, 242 U.S. 470, 495, 37 S. Ct. 192, 61 L. Ed. 442 (1917)

7   ("there is no absolute rule of law preventing convictions on the testimony of accomplices

8   if juries believe them."); United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.

9   1993) ("The uncorroborated testimony of an accomplice is enough to sustain a

10  conviction unless it is incredible or insubstantial on its face"). California Penal Code §

11  1111, which requires corroboration of accomplice testimony, is a "state law requirement"

12  which is "not required by the Constitution or federal law." Laboa v. Calderon, 224 F.3d

13  972, 979 (9th Cir. 2000). Petitioner's claim that uncorroborated accomplice testimony

14  was improperly used to support his conviction is based solely on a perceived error of

15  state law and is therefore not cognizable in this federal habeas corpus proceeding.

16  Pulley v. Harris, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the

17  basis of a perceived error of state law.").

18         Because the testimony of Petitioner's co-defendants was neither incredible nor

19  insubstantial on its face, Petitioner is only entitled to habeas corpus relief if the state

20  court's alleged violation of state law denied him his due process right to fundamental

21  fairness. Laboa, 224 F.3d at 979. Here, the evidence introduced at Petitioner's trial,

22  including the testimony of his accomplices, was sufficient to support his convictions. See

23  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (there is sufficient evidence to support a

24  conviction if, "after viewing the evidence in the light most favorable to the prosecution,

25  any rational trier of fact could have found the essential elements of the crime beyond a

26  reasonable doubt.").

27         Further, "[a] State violates a criminal defendant's due process right to

28  fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement."

1   Laboa, 224 F.3d at 979 (citing Hicks v. Oklahoma, 447 U.S. 343, 346 (1980)). State

2   criminal procedures do not violate the Due Process Clause unless they "offend[] some

3   principle of justice so rooted in the traditions and conscience of our people as to be

4   ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 43 (1996). Here, the

5   California Court of Appeal carefully reviewed the evidence and determined that, under

6   state law, sufficient evidence, even aside from the accomplice testimony, supported

7   Petitioner's convictions. This determination by the Court of Appeal is supported by the

8   facts of this case and does not constitute an arbitrary denial of a state law entitlement.

9   Further, the court's ruling does not offend any fundamental principle of justice or render

10  Petitioner's trial fundamentally unfair. Accordingly, Petitioner is not entitled to relief on his

11  claim that there was insufficient evidence to support his convictions.

12              **C.     Claim Three: Cumulative Error**

13          In his final claim for relief, Petitioner argues that the cumulative effect of the errors

14  at his trial violated his right to due process and a fair trial. (Pet., ECF No. 1 at 5, 13-15.)

15  The claim was presented to the California Court of Appeal, and denied in a reason

16  decision. (See Answer, Ex. A.) The court held:

17              Finally, appellant contends "[t]he errors pertaining to the
            accomplice testimony had a cumulative impact on the constitutionality of
18          the trial." This contention is without merit.

19          "Lengthy criminal trials are rarely perfect, and this court will not reverse a
            judgment absent a clear showing of a miscarriage of justice. [Citations.]"
20          (People v. Hill (1998) 17 Cal.4th 800, 844.) "Nevertheless, a series of trial
            errors, though independently harmless, may in some circumstances rise
21          by accretion to the level of reversible and prejudicial error." (Ibid.) Because
            we have concluded that there were no prejudicial errors, it follows that
22          there were no errors to cumulate, and we reject appellant's argument to
            the contrary.
23
    (Pet., Ex. A at *21.)
24
            The Ninth Circuit has concluded that under clearly established United States
25
    Supreme Court precedent, the combined effect of multiple trial errors may give rise to a
26
    due process violation if it renders a trial fundamentally unfair, even where each error
27
    considered individually would not require reversal. Parle v. Runnels, 505 F.3d 922, 927
28

1  (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) and

2  Chambers v. Mississippi, 410 U.S. 284, 290 (1973)). See also Hayes v. Ayers, 632 F.3d

3  500, 524 (9th Cir. 2011) (if no error of constitutional magnitude occurred at trial, "no

4  cumulative prejudice is possible"). "The fundamental question in determining whether the

5  combined effect of trial errors violated a defendant's due process rights is whether the

6  errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294,

7  and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."

8  Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

9      This Court has addressed each of Petitioner's claims raised in the instant petition

10  and has concluded that no error of constitutional magnitude occurred at his trial in state

11  court. This Court also concludes that the errors alleged by Petitioner, even when

12  considered together, did not render his defense "far less persuasive," nor did they have

13  a "substantial and injurious effect or influence on the jury's verdict." Accordingly,

14  Petitioner is not entitled to relief on his claim of cumulative error.

15  **IV.    RECOMMENDATION**

16      Accordingly, it is hereby recommended that the petition for a writ of habeas

17  corpus be DENIED with prejudice.

18      This Findings and Recommendation is submitted to the assigned District Judge,

19  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

20  being served with the Findings and Recommendation, any party may file written

21  objections with the Court and serve a copy on all parties. Such a document should be

22  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

23  to the objections shall be served and filed within fourteen (14) days after service of the

24  objections.

25  ///

26  ///

27  ///

28  ///

1        The parties are advised that failure to file objections within the specified time may

2   waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

3   Cir. 1991).

4

5

6   IT IS SO ORDERED.

7       Dated:   <u>July 30, 2013</u>          <u>   /s/ *Michael J. Seng* </u>

8                                     UNITED STATES MAGISTRATE JUDGE